UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DOW JONES & COMPANY, INC.

                Plaintiff,

   v.

REAL-TIME ANALYSIS & NEWS, LTD. (d/b/a "Ransquawk"),

                Defendant.

Civil Action No.
1:14-cv-00131-JMF

**PLAINTIFF DOW JONES & COMPANY, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS ORDER TO SHOW CAUSE FOR ENTRY OF DEFAULT
JUDGMENT, INJUNCTION AND DAMAGES**

PATTERSON BELKNAP WEBB & TYLER LLP
Robert P. LoBue (rplobue@pbwt.com)
Jonah M. Knobler (jknobler@pbwt.com)
Adam E. Pinto (apinto@pbwt.com)
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
*Attorneys for Plaintiff Dow Jones & Company, Inc.*

6926260v.1

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .............................................................................................................1

    A.    The Business Of Dow Jones ..................................................................................1

    B.    The DJX Product And DJ Dominant ....................................................................2

    C.    The Business Of Ransquawk ................................................................................4

    D.    Ransquawk's Hot News Misappropriation.............................................................5

    E.    Ransquawk Flouts Dow Jones and Implausibly Denies Its Illicit Activity ............7

ARGUMENT .................................................................................................................................10

I.    THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS
    ACTION AND PERSONAL JURISDICTION OVER RANSQUAWK ........................10

    A.    The Court Has Subject Matter Jurisdiction..........................................................10

    B.    The Court Has Personal Jurisdiction over Defendant............................................10

    C.    Process Was Properly Served on Defendant..........................................................13

II.    PLAINTIFF HAS STATED CLAIMS FOR RELIEF....................................................13

    A.    New York Law Governs .......................................................................................13

    B.    Dow Jones Has Stated Claims For Relief.............................................................15

        1.    Hot News Misappropriation......................................................................16

        2.    Tortious Interference with Contractual Relations.....................................17

III.    DOW JONES IS ENTITLED TO DAMAGES AND INJUNCTIVE RELIEF ...............18

    A.    A "Reasonable Royalty" Measure Of Damages Is Appropriate ...........................18

    B.    A Reasonable Royalty Would Be At Least $5 Million..........................................20

    C.    Punitive Damages Should Be Assessed................................................................23

    D.    Dow Jones Is Entitled To Injunctive Relief.........................................................25

CONCLUSION..............................................................................................................................27

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*,
   828 F. Supp. 2d 557 (E.D.N.Y. 2011) .................................................................................11

*Action S.A. v. Marc Rich & Co., Inc.*,
   951 F.2d 504 (2d Cir. 1991).................................................................................................24

*Amador v. Galbreath*,
   2013 U.S. Dist. LEXIS 58712 (W.D.N.Y. Apr. 24, 2013) ..................................................24

*Associated Press v. All Headline News Corp.*,
   608 F. Supp. 2d 454 (S.D.N.Y. 2009)...............................................................13, 14, 15, 17

*Bakalar v. Vavra*,
   619 F.3d 136 (2d Cir. 2010)................................................................................................14

*Barclays Capital Inc. v. TheFlyOnTheWall.com, Inc.*,
   650 F.3d 876 (2d Cir. 2011)...........................................................................................16, 26

*Barclays Capital, Inc. v. Theflyonthewall.com*,
   700 F. Supp. 2d 310 (S.D.N.Y. 2010), *rev'd*, 650 F.3d 876 (2d Cir. 2011)...........................26

*Bose Corp. v. JBL, Inc.*,
   112 F. Supp. 2d 138 (D. Mass. 2000) .................................................................................22

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)............................................................................................................12

*CAC Grp. Inc. v. Maxim Grp. LLC*,
   523 F. App'x 802 (2d Cir. 2013) .........................................................................................17

*Capitol Records, LLC v. VideoEgg, Inc.*,
   611 F. Supp. 2d 349 (S.D.N.Y. 2009).................................................................................15

*Cargill, Inc. v. Sears Petrol. & Transp. Corp.*,
   388 F. Supp. 2d 37 (N.D.N.Y. 2005) ..................................................................................19

*Carvel v. Noonan*,
   350 F.3d 6 (2d Cir. 2003)....................................................................................................24

*Cavalier Label Co. v. Polytam, Ltd.*,
   687 F. Supp. 872 (S.D.N.Y. 1988) .....................................................................................11

*Chloe v. Queen Bee of Beverly Hills, LLC*,
    616 F.3d 158 (2d Cir. 2010)...........................................................................13

*CNN, L.P. v. GoSMS.com, Inc.*,
    2000 U.S. Dist. LEXIS 16156 (S.D.N.Y. Nov. 6, 2000).........................................12

*Daimler AG v. Bauman*,
    134 S. Ct. 746 (2014)....................................................................................13

*Davis v. The Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001)...........................................................................20

*eBay, Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006)...............................................................................25, 26

*Electro-Miniatures Corp. v. Wendon Co.*,
    771 F.2d 23 (2d Cir. 1985).............................................................................19

*Fin. Info., Inc. v. Moody's Inv. Serv., Inc.*,
    808 F.2d 204 (2d Cir. 1986)...........................................................................18

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970).................................................................22

*Getty Petrol. Corp. v. Island Transp. Corp.*,
    878 F.2d 650 (2d Cir. 1989)...........................................................................23

*Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*,
    973 F.2d 155 (2d Cir. 1992)...........................................................................10

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
    50 N.Y.2d 183 (1980)...................................................................................20

*Gucci Am., Inc. v. Frontline Processing Corp.*,
    721 F. Supp. 2d 228 (S.D.N.Y. 2010)..............................................................12

*IBM v. Liberty Mut. Ins. Co.*,
    363 F.3d 137 (2d Cir. 2004)...........................................................................14

*In re Allstate Ins. Co.*,
    81 N.Y.2d 219 (1993)...............................................................................16, 17

*Ingraham v. Carroll*,
    90 N.Y.2d 592 (1997)...................................................................................12

*Int'l Minerals & Resources, S.A. v. Bomar Resources, Inc.*,
    5 F. App'x 5 (2d Cir. 2001)...........................................................................24

*International News Service v. Associated Press*,
   248 U.S. 215 (1918)..................................................................................................16, 17, 26

*Inventio AG v. Otis Elevator Co.*,
   2011 U.S. Dist. LEXIS 87215 (S.D.N.Y. Aug. 4, 2011).........................................................25

*Linkco, Inc. v. Fujitsu Ltd.*,
   230 F. Supp. 2d 492 (S.D.N.Y. 2002)...............................................................................20, 21

*Member Servs. v. Sec. Mut. Life Ins. Co.*,
   2011 U.S. Dist. LEXIS 56910 (N.D.N.Y. May 26, 2011)......................................................21

*Merino v. Beverage Plus Am. Corp.*,
   2012 U.S. Dist. LEXIS 140679 (S.D.N.Y. Sept. 25, 2012)....................................................24

*Mickowski v. Visi-Trak Corp.*,
   36 F. Supp. 2d 171 (S.D.N.Y. 1999)......................................................................................23

*NBA v. Motorola, Inc.*,
   105 F.3d 841 (2d Cir. 1997).............................................................................................16, 17

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...............................................................................................22

*Penguin Group (USA), Inc. v. Am. Buddha*,
   16 N.Y.3d 295 (N.Y. 2011) .............................................................................................12, 15

*Sensonics, Inc. v. Aerosonic Corp.*,
   81 F.3d 1566 (Fed. Cir. 1996)................................................................................................21

*Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*,
   926 F.2d 1161 (Fed. Cir. 1991)..............................................................................................23

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
   438 F. App'x 45 (2d Cir. 2011) ..............................................................................................19

*Sybron Corp. v. Wetzel*,
   46 N.Y.2d 197 (N.Y. 1978) ...................................................................................................12

*Telemac Corp. v. US/Intelicom Inc.*,
   185 F. Supp. 2d 1084 (N.D. Cal. 2001) .................................................................................23

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
   69 F.3d 512 (Fed. Cir. 1995)..................................................................................................21

*United States Frumentum Co. v. Lauhoff*,
   216 F. 610 (6th Cir. 1914) .....................................................................................................19

*United States v. Hooker Chems. & Plastics Corp.*,
  748 F. Supp. 67 (W.D.N.Y. 1990) ...................................................................................25

*Veritas Operating Corp. v. Microsoft Corp.*,
  2008 U.S. Dist. LEXIS 112135 (W.D. Wash. Feb. 26, 2008) .................................................20

*Vt. Microsys. v. Autodesk, Inc.*,
  138 F.3d 449 (2d Cir. 1998)................................................................................................20

*Walden v. Fiore*,
  134 S. Ct. 1115 (2014)........................................................................................................13

## STATUTES

28 U.S.C. § 1332(a)(2) ........................................................................................................10

CPLR § 302(a)(1) ..........................................................................................................10, 11

CPLR § 302(a)(3) ..........................................................................................................11, 12

CPLR § 302(a)(3)(i) .......................................................................................................12, 11

CPLR § 302(a)(3)(ii) ......................................................................................................12, 11

## OTHER AUTHORITIES

1-20 Chisum on Patents § 20.07 .......................................................................................20, 22

Fed. R. Civ. P. 4(f)(2)(C)(ii) ..............................................................................................13

Fed. R. Civ. P. 8(b)(6) .......................................................................................................10

Fed. R. Civ. P. 54(c) .........................................................................................................23

Fed. R. Civ. P. 55(b) ...........................................................................................................1

Hague Convention Article 15 ...............................................................................................13

Restatement 3d Unfair Competition § 36 cmt. d & Reporter's Notes...........................................19

Restatement 3d Unfair Competition § 49 cmt. d .....................................................................19

S.D.N.Y. Local Rule 55.1 .....................................................................................................1

S.D.N.Y. Local Rule 55.2 .....................................................................................................1

## PRELIMINARY STATEMENT

Plaintiff Dow Jones & Company, Inc. ("Dow Jones"), the premier provider of business and financial news, has sued Defendant Real-Time Analysis & News, Ltd. d/b/a Ransquawk ("Ransquawk") for common-law misappropriation of hot news and tortious interference with contract.  These claims are based on Ransquawk's systematic practice of retransmitting Dow Jones headlines to Ransquawk's own paying customers via the Internet within seconds after Dow Jones breaks the news—without doing any reporting of its own.  This unlawful free-riding not only devalues Dow Jones's flagship digital news service, it also threatens the very economic structure upon which journalistic enterprises such as Dow Jones are built and upon which its customers depend.

In accordance with Fed. R. Civ. P. 55(b), S.D.N.Y. Local Rules 55.1 and 55.2, and this Court's individual rules for default judgments, Dow Jones seeks entry of a judgment declaring Ransquawk liable to Dow Jones for its misconduct, and awarding both monetary damages in the amount of $5 million and appropriate injunctive relief.  Declarations and exhibits are submitted with this motion to support Dow Jones's claim for damages.

## STATEMENT OF FACTS

### A.    The Business Of Dow Jones

Dow Jones is a widely known and respected publisher of business news and information. (Compl. ¶ 12, annexed as Exhibit A to Declaration of Adam E. Pinto submitted herewith ("Pinto Decl.").)  It provides news and information through its newswires, websites, newspapers, newsletters, databases, magazines, and radio and video reports.  (*Id.*)  Dow Jones is able to collect and provide accurate, comprehensive, and timely news and business information to its millions of worldwide customers through the significant efforts of its journalists and its substantial investments in its worldwide journalistic infrastructure.  (*Id.*)

Dow Jones's flagship publication is *The Wall Street Journal*.  (Compl. ¶ 13.)  Founded in 1889, *The Wall Street Journal* is America's largest daily newspaper by paid circulation, with a circulation of more than 2.2 million readers.  (*Id.*)  In addition, Dow Jones publishes *Barron's* and MarketWatch.com, and operates Dow Jones Newswires, which provides real-time business news and information to hundreds of thousands of financial professionals around the world.  (*Id.*)  In 2013, Dow Jones created DJX, an online subscription product that includes original news and analysis from all Dow Jones-owned publications and other news and information resources.  (*Id.*)

With only a few carefully chosen exceptions, Dow Jones serves as the exclusive distributor of its original news content and does not authorize third parties to distribute that content.  (Compl. ¶ 14.)  Dow Jones's vigilant oversight of the channels by which its content is distributed adds significant value to Dow Jones's products and services, which in turn supports Dow Jones's continuing ability to investigate, report, and publish the news.  (*Id.*)

## B.      The DJX Product And DJ Dominant

Among other things, DJX provides real-time online news and analysis to paid subscribers via live, streaming newsfeeds of headlines and articles generated by Dow Jones.  (Compl. ¶ 15.)  Users can customize their newsfeeds based on their interests or view newsfeeds curated by Dow Jones.  (*Id.*)  One of these curated newsfeeds, called DJ Dominant, is a critical element of DJX.  (Compl. ¶ 16.)  DJ Dominant compiles in one place exclusive real-time news and analysis from Dow Jones and *The Wall Street Journal* that can impact markets and that is available nowhere else in the world.  (*Id.*)

DJ Dominant appears on a subscriber's DJX screen as a series of scrolling headlines listed in reverse chronological order.  (Compl. ¶ 17.)  Some of the headlines are hyperlinks to full-text news articles; others are stand-alone headlines that contain the news Dow Jones is reporting.  (*Id.*)  When its reporters break news, Dow Jones typically posts to DJ Dominant one

or more stand-alone headlines to rapidly communicate hot news to subscribers.  (*Id.*)  Dow Jones

generally supplements those headlines with full-text articles shortly thereafter.  (*Id.*)  DJ

Dominant draws on news developed by reporters for Dow Jones's various publications and

destined for subsequent publication in different Dow Jones services tailored to specific markets

or areas of interest, including *The Wall Street Journal* and Dow Jones Newswires.  (*Id.*)

DJ Dominant is a "time-advantaged" service.  (Compl. ¶ 18.)  By design, it contains Dow

Jones's hottest, most time-sensitive news before Dow Jones publishes that news anywhere else.

(*Id.*)  Dow Jones has a long history of this kind of tiered distribution of news, and has long

charged a premium price to customers who want to receive news more quickly.  (*Id.*)  Dow

Jones's hot news is typically published first on DJ Dominant, then to Dow Jones Newswires

customers who have not subscribed to DJ Dominant, then to WSJ.com, and then in the print

edition of *The Wall Street Journal* the next day.  (*Id.*)  At its core, DJ Dominant is a collection of

Dow Jones's most valuable and proprietary news and analysis, made more valuable by being

available exclusively to subscribers before others see it.  (Compl. ¶ 19.)  "Scoops" of the sort that

are posted on the DJ Dominant feed are often the product of considerable newsgathering efforts

by one or more Dow Jones journalists.  (*Id.*)

The electronic delivery of business and financial news is a highly competitive business in

which vendors (including Dow Jones) tout their ability to break news that can impact markets

before other sources do.  (Compl. ¶ 20.)  Dow Jones highlights this feature for current and

potential subscribers, emphasizing that DJX can enable them to identify and analyze investing,

trading, and hedging opportunities and capitalize on them before their competitors.  (*Id.*)

Customers subscribe directly to DJX by entering into a paid subscription agreement with

Dow Jones.  (Compl. ¶ 21.)  The agreement permits users to "access, review, download and

print" information from DJX for the user's own use.  (*Id.*)  The agreement requires that users not

"reproduce, distribute, display, sell, publish, broadcast, or circulate" DJX content to any third

party, or make that content available for any such use.  (*Id.*)  All subscribers to DJX must sign

either the Dow Jones Master Products Terms and Conditions (the "Master Agreement") or

similar contractual terms restricting their ability to redistribute DJX content.  (*Id.*)

**C.     The Business Of Ransquawk**

Ransquawk operates a commercial website (ransquawk.com) that claims to "deliver a

faster, clearer unbiased real-time voice & text newsfeed."  (Compl. ¶ 23.)  It claims to be the

"[w]orld's #1 squawk[1] covering US, Europe and Asia-Pac 24 hours a day," states that "8/10 of

the world's largest banks use Ransquawk," and boasts that Ransquawk "provid[es] unmatched,

instant coverage of Equities, Fixed Income, Energy & Forex."  (*Id.*)  The site alleges that

Ransquawk is "the best real-time audio squawk for traders," one of the same customer bases

Dow Jones targets with its DJ Dominant newswire.  (*Id.*)

Ransquawk's main offering is a subscription-based software application accessed over the

Internet and through a mobile app.  (Compl. ¶ 24.)  It includes two components:  a live audio

"squawk" broadcast (the "audio" component) and an auto-updating text-based newsfeed (the

"text" component) that allows subscribers to "see what [they] hear."  (*Id.*)  Ransquawk's website

explains that its "team of analysts monitors over 100 news sources so you don't have to."  (*Id.*)

The front page of ransquawk.com includes a "Client testimonies" section in which a

Chicago-based client of Ransquawk states that "RANsquawk is the news source that we use that

---

[1] A "squawk" is an online service that traces its lineage to "squawk boxes," physical intercom speakers
that were once found on trading desks in investment banks and stock brokerages that announced news and
other information to those working on the trading desk.  Today, "squawk" services provide audio feeds of
breaking, market-shifting news over the Internet.  (Compl. ¶ 22.)

gives us the information that matters now.  It aggregates all the major news wires and delivers the information that counts."  (Compl. ¶ 25.)

At various times, Ransquawk has claimed to have anywhere from 15,000 to 30,000 subscribers.  (Declaration of Jason Malatesta ("Malatesta Decl.") ¶ 19.)  It was reported that on March 4, 2014, approximately 36% of visitors to its website have IP addresses located in the United States (Pinto Decl. ¶ 15).

### D.      Ransquawk's Hot News Misappropriation

Ransquawk systematically copies and retransmits verbatim, or nearly verbatim, content from the DJ Dominant newsfeed that was reported, written, and edited by journalists working for Dow Jones.  (Compl. ¶ 27.)  Ransquawk has done so without any license from Dow Jones, and Dow Jones would not have agreed to such a license had Ransquawk sought to legitimately procure one.  (*Id.*)

Ransquawk often broadcasts DJ Dominant headlines within five seconds or less of the original posting on DJ Dominant.  (Compl. ¶ 28.)  On one recent occasion, a breaking news headline announcing the timing of Twitter's initial public stock offering—a significant Dow Jones scoop first published exclusively on DJX—was broadcast word-for-word by Ransquawk through its audio feed two seconds after running on DJ Dominant, and before Dow Jones published that news through any other channel.  (*Id.*)

Ransquawk's text service similarly copies DJ Dominant news that has just been published by Dow Jones.  (Compl. ¶ 29.)  Ransquawk's text reproductions of Dow Jones's headlines typically appear within one or two minutes of that news's initial publication by Dow Jones.  (*Id.*)

Ransquawk does not credit Dow Jones for any of the hot news it copies from DJ Dominant, instead generically crediting all Dow Jones stories (along with, upon information and

belief, those copied from other third party content providers) to "Source: Newswires." (Compl. ¶ 30.)

Absent discovery, Dow Jones is unable to identify every instance of Ransquawk's verbatim or near-verbatim copying of its hot news content, and is unable to state when Ransquawk's unauthorized republication commenced. However, the chart Dow Jones attached to its Complaint as Exhibit A lists 37 illustrative examples that happened to occur while Dow Jones was monitoring Ransquawk's service between October 17, 2013 and November 11, 2013.[2]

No doubt there were far more such instances. One DJ Dominant subscriber contacted Dow Jones on September 24, 2013 to state that, as of that date, Ransquawk was "blasting out your [DJ D]ominant headlines as soon as they print," thereby "tak[ing] away all the edge" the subscriber was paying Dow Jones to receive. (Malatesta Decl. ¶ 9.) That same subscriber complained again on October 3, 2013, noting that Ransquawk was still "pounding out your headlines" and "killing the edge." (*Id.* ¶ 10.) And, although Ransquawk blocked Dow Jones's direct access to its service after Dow Jones's counsel demanded that Ransquawk cease and desist (Compl. ¶ 37), Dow Jones has been able to determine that Ransquawk's misappropriation continues through the present day. (Pinto Decl. ¶ 13, Exh. I.)

The timeliness of business and financial news reporting is essential to many subscribers to the DJ Dominant newswire—particularly the traders both Dow Jones and Ransquawk target with their breaking news products. (Compl. ¶ 33.) Ransquawk competes directly with Dow Jones's DJX product for subscriptions by end-users. (*Id.*)

Because Ransquawk distributes news copied verbatim from DJ Dominant in competition with Dow Jones without incurring the costs Dow Jones incurs to originate the news, Ransquawk

---

[2] Dow Jones's monitoring of Ransquawk during this period was not continual; in particular, Dow Jones did not monitor Ransquawk's activity from October 31 through November 5. (Compl. ¶ 31.)

is able to offer its products and services to Dow Jones's targeted customer base at a substantially lower price than Dow Jones can offer similar products and services.  (Compl. ¶ 34.) Ransquawk's actions divert business opportunities from Dow Jones and, for many potential customers, threaten to satisfy the demand for breaking business news that would otherwise be fulfilled by subscriptions to Dow Jones's DJ Dominant newswire.  (*Id.*)  Indeed, this has been Ransquawk's admitted object for years.  In 2007, before Ransquawk thought better of it and removed the language entirely, its website candidly professed:

> Many traders rely solely on reading financial newswires (EXPENSIVE) . . . to keep them informed on what is happening in the world. You don't have to. We deliver this news to you – AS IT BREAKS! – by way of an internet 'squawk box' – ***removing the need to pay for expensive news information systems yourselves.***

 (Malatesta Decl. ¶ 11, Exh. E (emphasis added)).

Ransquawk's free-riding on Dow Jones's extensive newsgathering efforts is likely to undermine Dow Jones's economic incentive to invest in the costly process of reporting time-sensitive news.  (Compl. ¶ 34.)

## E.   Ransquawk Flouts Dow Jones and Implausibly Denies Its Illicit Activity

After being alerted to Ransquawk's copying of exclusive Dow Jones content, Dow Jones investigated Ransquawk's actions through a series of free trial subscriptions to Ransquawk's service.  (Compl. ¶ 35.)  Those trial subscriptions were made available by Ransquawk to New York residents who, as part of signing up for the trial, had to identify themselves as U.S. residents living in the Eastern Time Zone and provide phone numbers—all of which had New York area codes.  (*Id.*)

After monitoring and recording Ransquawk's activities for a number of weeks, Dow Jones counsel sent a "cease-and-desist" letter to Ransquawk on November 11, 2013.  (Compl. ¶ 36 & Ex. B.)  The letter informed Ransquawk that it was copying Dow Jones's content in a

manner that constituted hot news misappropriation and breach of, or tortious interference with, Dow Jones's subscription agreements.  (*Id.*)  Dow Jones demanded that Ransquawk cease its unauthorized copying of Dow Jones's content and remove Dow Jones's content from its computers.  (*Id.*)

The cease-and-desist letter was emailed to one of Ransquawk's principals, to an email address provided over the telephone by Ransquawk, on November 11.  (Compl. ¶ 37.)  For at least the two days thereafter, Ransquawk willfully flouted Dow Jones's rights and continued reproducing and squawking DJ Dominant content via both its audio and text services.  (*Id.*)  At that point, Ransquawk proceeded to block all further efforts by Dow Jones or its agents and attorneys to access its service in order to monitor Ransquawk's continued exploitation of Dow Jones news.  (*Id.*)  Indeed, Ransquawk has since blocked Dow Jones's counsel even from visiting Ransquawk's *public homepage* at http://www.ransquawk.com.  (Pinto Decl. ¶ 14, Exh. J.)

Despite Ransquawk's apparent efforts to block Dow Jones from observing its wrongful conduct, Dow Jones has been able to determine from outside the Patterson Belknap network that in the time period subsequent to the delivery of the cease-and-desist letter and continuing to the present, Ransquawk continues to copy DJ Dominant content.  (Compl. ¶ 38; Pinto Decl. ¶ 13, Exh. I.)  To this day, DJ Dominant content routinely appears on Ransquawk's newsfeed with a time stamp that is within a minute or two of it being posted by Dow Jones.  (*Id.*)  Upon information and belief, Ransquawk has also continued its practice of rebroadcasting Dow Jones's content through its audio service, and that conduct is ongoing as of the date of this filing.  (*Id.*)

Ransquawk responded to Dow Jones through its solicitors, MacRae & Co LLP, on November 26, 2013.  (Compl. ¶ 39 & Ex. C.)  The letter admitted that Ransquawk "has not entered directly or indirectly into a subscriber agreement for the DJX service."  (*Id.*)  The letter

"totally denie[d]" that Ransquawk took any material directly from DJX; instead, it claimed Ransquawk obtained the content via: (1) "various twitter sources"; (2) instant messages from journalists at Dow Jones and in investment banks and brokerages in New York and Chicago; (3) other "squawk" services, "all of whom seem to subscribe to Dow Jones news"; and (4) "various spread betters and FX brokers that carry Dow Jones news." (*Id.*) Ransquawk also admitted that it does not cite Dow Jones when copying its stories, and claimed that this was because Ransquawk "cannot be sure that the story comes originally from Dow Jones." (*Id.*)

The assertions and denials of Ransquawk's counsel are not just implausible, but in many instances physically impossible. (Compl. ¶ 40.) Ransquawk's audio service frequently replicates DJX content word for word within five seconds or less of its being posted on DJ Dominant. (*Id.*) If Ransquawk's claims were true, a third party would have to have a DJX subscription that it is constantly reviewing in case any breaking news is posted. (*Id.*) The third party would then have to transcribe Dow Jones's content onto its own service (or an instant messenger program). (*Id.*) The third party would then have to publish that content online (or send the message). (*Id.*) Ransquawk would then have to read the third party's copy of Dow Jones's news. (*Id.*) A Ransquawk employee would then have to determine whether to reproduce the Dow Jones news item. (*Id.*) And finally, Ransquawk would have to broadcast that content to its subscribers through its audio service—all within five seconds or less of Dow Jones's original publication of the news to DJX. (*Id.*)

As advanced as technology is in 2014, it is entirely implausible that Ransquawk, a company that monitors "over 100 news sources" according to its website, could take all of those actions in five seconds or less (particularly as at least half of the process involves a third party). (Compl. ¶ 41.) The only way that Ransquawk could possibly copy Dow Jones's news with such

rapidity is by watching news break live on the DJ Dominant feed and then reading the headline verbatim out loud to its subscribers. (*Id.*)

In the alternative, even if Ransquawk were somehow obtaining Dow Jones news from third party sources, Ransquawk knows that it is doing so by inducing breach of or interfering with contract because none of the alleged sources its counsel enumerated in the November 26, 2013 letter is authorized to redistribute Dow Jones news.  (Compl. ¶ 42.)

## <u>ARGUMENT</u>

Because Ransquawk has been duly served but has failed to appear, the factual allegations in Dow Jones's Complaint are deemed admitted.  *See* Fed. R. Civ. P. 8(b)(6); *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  Based on those admitted facts, and the additional facts submitted in connection with this motion, we will demonstrate that (1) the Court has jurisdiction over the defendant and this claim, (2) Dow Jones has stated claims for relief under New York law, and (3) Dow Jones is entitled to the damages and injunctive relief it has requested.

## I.      THE COURT HAS SUBJECT MATTER JURISDICTION OVER THIS ACTION AND PERSONAL JURISDICTION OVER RANSQUAWK

### A.      The Court Has Subject Matter Jurisdiction

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), because it is an action between "between . . . citizens of a State and citizens or subjects of a foreign state" (Compl. ¶¶ 5-6), and because the matter in controversy in this action exceeds $75,000, exclusive of interest and costs (Compl., Prayer for Relief).

### B.      The Court Has Personal Jurisdiction over Defendant

This Court has personal jurisdiction over Ransquawk pursuant to N.Y. CPLR § 302(a)(1) because Ransquawk is a non-domiciliary who "transact[ed] . . . business within" New York

and/or "contract[ed] anywhere to supply goods or services in" New York.  The "contracts anywhere" clause, in particular, is "intended to 'extend New York long arm jurisdiction to [its] constitutionally permissible limits . . . .'"  *Cavalier Label Co. v. Polytam, Ltd.*, 687 F. Supp. 872, 877 (S.D.N.Y. 1988).  A "single transaction…suffice[s]" to assert jurisdiction, and "physical presence by the defendant in the forum state during the activity is not necessary."  *A.W.L.I. Grp., Inc. v. Amber Freight Shipping Lines*, 828 F. Supp. 2d 557, 565 (E.D.N.Y. 2011).

Among other factors that give rise to jurisdiction under CPLR 302(a)(1), Ransquawk's website states that it has employees and agents with offices in New York.  (Compl. ¶ 8.) Ransquawk has made free trials of its products available to individuals in New York (including agents of Dow Jones).  (Compl. ¶¶ 8, 35.)  It actively solicits the business of New York customers, and has subscribers to its services in New York.  (Compl. ¶ 8.)  Indeed, Ransquawk's service was consciously *designed* for the New York market in large part, in that it was intended specifically for traders, investment bankers, and similar financial professionals (Compl. ¶¶ 23, 33-34), and—as this Court may take judicial notice—New York is one of the world's preeminent hubs of finance.

This Court also has personal jurisdiction over Ransquawk pursuant to N.Y. CPLR § 302(a)(3).  This provision applies to Ransquawk's conduct because it "commit[ted] a tortious act without the state causing injury to persons or property within the state" and, as described below, its actions satisfy the requirements of § 302(a)(3)(i) or, alternatively, § 302(a)(3)(ii). Ransquawk's above-described acts resulted in the poaching of New York customers—namely, the traders who are both Dow Jones's and Ransquawk's target audience.  (Compl. ¶¶ 23, 33-34). It has long been settled that the loss of New York customers, or lost sales in the New York

market, is "injury within" New York for purposes of § 302(a)(3).[3]  Dow Jones is based in New

York, and experienced the harms caused by Ransquawk's tortious conduct in New York.  *See*

*Penguin Group (USA), Inc. v. Am. Buddha*, 16 N.Y.3d 295 (N.Y. 2011) (defendant's uploading

of copyrighted material to the Internet caused injury in New York because copyright owner was

a New York entity).

Furthermore, N.Y. CPLR § 302(a)(3)(i) is satisfied because, as described above,

Ransquawk regularly does or solicits business in New York and derives substantial revenue from

services rendered in New York.  (Compl. ¶ 10.)  Alternatively, N.Y. CPLR § 302(a)(3)(ii) is

satisfied because it was objectively foreseeable to Ransquawk that its tortious activity would

have consequences in New York, where both Ransquawk's and Dow Jones's chief customer base

is located and where Dow Jones is based, *see Ingraham v. Carroll*, 90 N.Y.2d 592, 598 (1997),

and because Ransquawk "derives substantial revenue . . . from interstate and international

commerce." (Compl. ¶ 10.)

Finally, the exercise of personal jurisdiction over Ransquawk comports with the Due

Process Clause of the United States Constitution.  By designing its service in part for the New

York market, soliciting New York customers, and otherwise actively targeting New York,

Ransquawk "has 'personally directed' [its] activities at residents of the forum."  *Burger King*

*Corp. v. Rudzewicz*, 471 U.S. 462, 472, 473 (1985).  The Due Process Clause's "reasonableness"

requirement is also satisfied: because Dow Jones has "made a threshold showing of minimum

---

[3] *See Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 201 (N.Y. 1978) (plaintiff "would indeed be injured in New York" if defendant's unfair competition resulted in "sales to plaintiff's New York customers"); *Gucci Am., Inc. v. Frontline Processing Corp.*, 721 F. Supp. 2d 228, 241-42 (S.D.N.Y. 2010) ("[i]njury within [the] state 'includes harm to a business in the New York market in the form of lost sales or customers'"); *CNN, L.P. v. GoSMS.com, Inc.*, 2000 U.S. Dist. LEXIS 16156, at *10 (S.D.N.Y. Nov. 6, 2000) ("Plaintiffs claim that New York residents, who are among plaintiffs' customers and potential customers, have been confused and deceived by defendants' use of plaintiffs' trademarked and copyrighted content.  These allegations are sufficient to allege harm within the state . . . .").

contacts," jurisdiction is presumptively reasonable, and Ransquawk must present "a *compelling* case that the presence of some other considerations would render jurisdiction unreasonable." *Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 164-65 (2d Cir. 2010) (quoting *Burger King*, 471 U.S. at 477) (emphasis added).  Ransquawk could not do so.[4]

  **C.**  **Process Was Properly Served on Defendant**

    The facts confirming proper service on defendant are set forth in the Declaration of Adam Pinto and exhibits thereto.  Defendant was served with the summons and complaint pursuant to the rules of this Court implementing the Hague Convention.  (Pinto Decl. ¶¶ 7-10, Exhs. G & H.)  Ransquawk was served on January 17, 2014 via FedEx sent by the Clerk of Court's office and under Fed. R. Civ. P. 4(f)(2)(C)(ii).  (Pinto Decl. ¶¶ 7-8, Exhs. G & H.)  Its response was due on February 7, 2014.  Ransquawk has not responded.  (*Id.*)  There is no doubt that defendant is aware of this action, because a courtesy copy of the summons and complaint was emailed to its attorneys on January 10, 2014, and a subsequent email sent to the same counsel on February 11, 2014 inquired whether Ransquawk intended to appear and defend (Pinto Decl. ¶¶ 3-6 and Exhs. C-F.)  Under the Hague Convention's Article 15, it is now proper to seek a judgment of default against Ransquawk.  (Pinto Decl. ¶¶ 9-10.)

**II.**  **PLAINTIFF HAS STATED CLAIMS FOR RELIEF**

  **A.**  **New York Law Governs**

    Although Ransquawk is based in the United Kingdom, New York substantive law applies to this dispute.  The forum state's choice-of-law rules govern this analysis.  *Associated Press v.*

---

[4] The Supreme Court's two recent personal-jurisdiction decisions do not affect this analysis, as Ransquawk's New York contacts involved the company purposefully reaching out into the New York market through its service and New York office to reach New York customers.  *See Walden v. Fiore*, 134 S. Ct. 1115 (2014); *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014).

*All Headline News Corp.*, 608 F. Supp. 2d 454, 459 (S.D.N.Y. 2009) (hereinafter "*Associated Press*") (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)).

Judge Castel's decision in *Associated Press* is on all fours and establishes that New York law governs a claim for hot news misappropriation brought by a New York-based publisher, even assuming that the domicile of the defendant does not recognize the tort.[5]  "Pursuant to New York law, 'the first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved.'"  *Id.* (quoting *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223 (1993)).  If there is no such conflict, the inquiry ends, and the court may apply New York law.  *See IBM v. Liberty Mut. Ins. Co.*, 363 F.3d 137, 143 (2d Cir. 2004).  Although we are aware of no decision of the English courts rejecting the hot news misappropriation doctrine, as in *Associated Press* this Court may simply assume *arguendo* that there is or may be a conflict between New York law and English law, and proceed to determine which jurisdiction "ha[s] the greatest interest in the litigation."  608 F. Supp. 2d at 459-60; *see also Bakalar v. Vavra*, 619 F.3d 136, 143-44 (2d Cir. 2010).

In *Associated Press,* the court conducted an interest analysis in a hot news misappropriation case and determined that New York law applied—notwithstanding that the defendant was a Florida entity and its web servers were located in Florida—because the plaintiff was "headquartered in New York and suffered the alleged injury in New York," and there was "no support for an argument that the fundamental public policy of Florida would be contravened by applying New York law."  608 F. Supp. 2d at 460-61.  Judge Castel also noted in passing that

---

[5] The analysis of misappropriation choice of law will also govern the claim for inducing breach of contract.  The Dow Jones subscription agreements with which Ransquawk interfered were made with the New York-based plaintiff for provision of news services from its headquarters in New York, and the injury to Dow Jones from the induced breach of those contracts was felt by plaintiff in New York.

the defendant, although based in Florida, was "alleged to have maintained an office and/or bureau in New York." *Id.* at 460.

The same considerations point to New York law in this case. Most importantly, Dow Jones is headquartered in New York (Compl. ¶ 5), and therefore, New York is the location of the injury. Ransquawk also claims to "ha[ve] employees and agents with offices in New York." (Compl. ¶ 8.) New York is one of the world's leading centers for the generation and publication of news content, so New York has an especially "substantial interest in protecting the intellectual property rights of [businesses] in the state" in a case of this nature. *Capitol Records, LLC v. VideoEgg, Inc.*, 611 F. Supp. 2d 349, 365 (S.D.N.Y. 2009) (noting, in an online copyright-infringement case, that New York had a heightened "interest in the adjudication of the issues raised by Plaintiff's complaint" because "this forum is home to numerous record companies").

Finally, the New York Court of Appeals' recent decision in *Penguin Group (USA), Inc. v. American Buddha* strengthens the argument for applying New York law. Although that case involved personal jurisdiction, not choice-of-law issues, the court made the relevant observation that, in a case involving the transmission of content via the Internet, "the out-of-state location of the infringing conduct carries less weight," and the location of the rightsholder's headquarters becomes the most important consideration, as the Internet "by its nature is intangible and ubiquitous" and "the place of uploading is [therefore] inconsequential." 16 N.Y. 3d at 304-05. Similarly, the mere fact that the mouse-clicks required to copy and paste Dow Jones's content may have occurred on a computer in London are "inconsequential" in the interest analysis.

### B.     Dow Jones Has Stated Claims For Relief

The facts alleged in Dow Jones's Complaint (and deemed true by virtue of Ransquawk's default) state a claim for relief under two legal theories: hot news misappropriation and tortious interference with contractual relations.

### 1.    Hot News Misappropriation

In the seminal case of *International News Service v. Associated Press*, 248 U.S. 215 (1918) ("*INS*"), the Supreme Court considered "whether one who has gathered . . . news at pains and expense for the purpose of subsequent publication . . . has such an interest in its publication as may be protected from interference" by competitors. *Id.* at 237. The Court concluded, under common-law unfair-competition principles, that the answer is yes—*i.e.*, that breaking news constitutes the "*quasi* property" of the entity that gathered it, and is protected from systematic republication by a competitor for a window of time sufficient "to prevent that competitor from reaping the fruits of [the gatherer's] efforts and expenditure." *Id.* at 236, 240-42.

Although *INS* was a pre-*Erie* decision that turned on federal common law, New York common law recognizes the *INS* cause of action as a branch of its own common law of unfair competition. *See NBA v. Motorola, Inc.*, 105 F.3d 841, 845 (2d Cir. 1997). Specifically, the Second Circuit has explained that an "*INS*-like claim" under New York law is available—and not preempted by the Copyright Act—in cases where:

> (i) a plaintiff generates or gathers information at a cost; (ii) the information is time-sensitive; (iii) a defendant's use of the information constitutes free-riding on the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or others would so reduce the incentive to produce the product or service that its existence or quality would be substantially threatened.

*Id.*; *see also id.* at 848-53. In *NBA* as well as in the more recent *Barclays Capital Inc. v. TheFlyOnTheWall.com, Inc.*, 650 F.3d 876 (2d Cir. 2011), the Second Circuit reaffirmed the viability of the hot news misappropriation tort, although on the facts of those cases found that the essential element of "free-riding" was unproved.

By contrast, the fact pattern of the present case (like the pleaded allegations in *Associated Press v. All Headline News,* which were held sufficient to state a claim under New York law) is a paradigmatic hot news misappropriation case.  Each of the five *NBA* factors is readily met here: Dow Jones "generates or gathers [its news content] at a cost."  (*See* Compl. ¶¶ 2, 12, 44.)  The news content Dow Jones transmits via its DJ Dominant feed is time-sensitive.  (*See* Compl. ¶¶ 18-20, 33, 45.)  Ransquawk's use of the factual information Dow Jones has gathered, in direct competition with Dow Jones, constitutes free-riding on [Dow Jones's] efforts.  (*See* Compl. ¶¶ 3, 26-30, 46-47.)  Ransquawk is in direct competition with a product or service offered by Dow Jones.  (*See* Compl. ¶¶ 23, 33-34, 47.)  And the ability of Ransquawk, and other parties like it, to systematically and persistently reproduce Dow Jones news within seconds after Dow Jones publishes it would so reduce the incentive to seek out and publish exclusive news that DJ Dominant's existence or quality would be substantially threatened.  (*See* Compl. ¶¶ 4, 34, 48.)  Indeed, the facts alleged here, and proved in the accompanying declaration of Dow Jones employee Jason Malatesta, are indistinguishable from those of *INS*, except in the technology used.

### 2.     Tortious Interference with Contractual Relations

"Under New York law, the elements of tortious interference with contract are (1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'"  *CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x 802, 806 (2d Cir. 2013) (quoting *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401-02 (2d Cir. 2006))).

Those elements are satisfied here.  Dow Jones has pleaded the existence of a contract— the "Dow Jones Terms of Use," to which all DJX customers must bind themselves.  (Compl. ¶¶

21, 57-58.)  Because Ransquawk admitted that it does not have a subscription to DJX (Compl., Ex. C at 1), the only way it could have received DJX content in real time was through illicit activity, such as through the cooperation of another party who *was* a DJX subscriber and was willing to violate the terms of service to which it had agreed by sharing the Dow Jones content with Ransquawk.  This contract  is standard in form and "requires . . . that users not 'reproduce, distribute, display, sell, publish, broadcast, or circulate' DJX content to any third party, or make that content available for any such use."  (Compl. ¶ 21.)  While Dow Jones pleaded that it is highly likely that Ransquawk "knew of the existence" of the Dow Jones Terms of Use, and of these particular contractual provisions, at all relevant times, it is documented that Ransquawk was placed on notice of the restrictive terms in the cease-and-desist letter delivered on November 11, 2013, and continued republishing Dow Jones news content thereafter.  (Compl. ¶ 59.) Ransquawk "intentionally" procured a Dow Jones subscriber to breach its contract, "without justification," by "grant[ing] Ransquawk access to DJX and provid[ing] Ransquawk with Dow Jones's content."  (Compl. ¶ 60-62.)  And this tortious interference "caused and continues to cause significant damage to Dow Jones" in the form of, *inter alia*, actual and potential Dow Jones subscribers diverted to Ransquawk.  (Compl. ¶ 34, 63.)

## III.   DOW JONES IS ENTITLED TO DAMAGES AND INJUNCTIVE RELIEF

### A.      A "Reasonable Royalty" Measure Of Damages Is Appropriate

Hot news misappropriation is "a branch of the [common-law] unfair competition doctrine."  *Fin. Info., Inc. v. Moody's Inv. Serv., Inc.*, 808 F.2d 204, 209 (2d Cir. 1986). Damages in hot news cases therefore should be assessed in the same manner as in other unfair-competition cases.

Under New York law, "[t]he measure of damages under a claim for unfair competition is 'the amount which the plaintiff would have made but for the defendant's wrong'"— typically

measured by the plaintiff's lost profits. *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 438 F. App'x 45, 48 (2d Cir. 2011) (quoting *Suburban Graphics Supp. Corp. v. Nagle*, 5 A.D.3d 663 (2d Dep't 2004)). "New York law does not . . . require that [an unfair-competition plaintiff] prove the amount of its losses with mathematical precision, instead demanding *only as much accuracy as circumstances permit*." *Cargill, Inc. v. Sears Petrol. & Transp. Corp.*, 388 F. Supp. 2d 37, 71 (N.D.N.Y. 2005) (emphasis added); *accord Electro-Miniatures Corp. v. Wendon Co.*, 771 F.2d 23, 27 (2d Cir. 1985) (a plaintiff is "not obligated to offer a mathematically precise measurement of [its] damages" and may "make a just and reasonable estimate of damages based on relevant data" (quoting *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946))).

In this case, it is difficult—if not impossible—to calculate Dow Jones's lost profits directly. Ransquawk has failed to appear, and Dow Jones consequently has no discovery of Ransquawk's subscribers' identities to show that Ransquawk poached particular Dow Jones clients. Moreover, even if Ransquawk had appeared, it would be difficult to establish which *prospective* Dow Jones subscribers were diverted to Ransquawk without inquiring into each subscriber's thoughts.

Under these circumstances, courts in all varieties of intellectual-property cases will assess a "reasonable royalty" as a measure of what was taken from the plaintiff as a result of the infringement. *See United States Frumentum Co. v. Lauhoff*, 216 F. 610, 615-17 (6th Cir. 1914) ("The real value – the actual value – of what has been taken is always the ultimate question. Proof of market value [of a license] is one way to show this actual loss; proof of lost sales is another way.").[6] This measure of damages has been used in a New York common-law unfair-competition case:

---

[6] *See, e.g.*, Restatement 3d Unfair Competition § 36 cmt. d & Reporter's Notes (trademark infringement); Restatement 3d Unfair Competition § 49 cmt. d (infringement of right of publicity); 1-20 Chisum on

> In trade secret misappropriation cases, . . . the courts have diverged from a straight lost profits analysis in cases where plaintiff's losses and defendant's actual gain cannot be easily computed.  A reasonable royalty award attempts to measure, as of the time of the misappropriation, a hypothetically agreed value of the property defendant wrongfully obtained. . . .  ***A similar method should be used with respect to the lost profits element of damages in an unfair competition claim because the same difficulties exist with respect to calculating potential profits.***
>
> Moreover, it is well established that if there is a claim, there must be a remedy. . . .  [T]he courts have fashioned a method for calculating damages for misappropriation of trade secrets in the absence of profits. ***The same method can be applied in the context of misappropriation of information.***

*Linkco, Inc. v. Fujitsu Ltd.*, 230 F. Supp. 2d 492, 503 (S.D.N.Y. 2002) (citations omitted).

The measure of damages for a claim of tortious interference with contract is "the full pecuniary loss of the benefits of the contract with which [the plaintiff] interfered." *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 197 (1980).  Because a reasonable royalty calculation is one method of approximating the "pecuniary loss" due to a defendant's tortious conduct, the same damage measure should apply to both of Dow Jones's causes of action.  *See Veritas Operating Corp. v. Microsoft Corp.*, 2008 U.S. Dist. LEXIS 112135, at *15-16 (W.D. Wash. Feb. 26, 2008) (holding that "a reasonable royalty is an appropriate measure of damages for the breach of a non-disclosure contract"; citing authorities).

### B.    A Reasonable Royalty Would Be At Least $5 Million

In assessing a reasonable royalty,

> the trier of fact should consider such factors as the resulting and foreseeable changes in the parties' competitive posture; the prices past purchasers or licensees may have paid; the total value of the [information misappropriated] to the plaintiff, including the plaintiff's development costs and the importance of the

---

Patents § 20.07 (patent infringement); *Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001) (copyright infringement); *see generally Vt. Microsys. v. Autodesk, Inc.*, 138 F.3d 449, 450 (2d Cir. 1998) (reasonable-royalty measure of damages "is well established in the law").

> [information] to the plaintiff's business; the nature and extent of
> the use the defendant intended for the [information]; and finally
> whatever other unique factors in the particular case which might
> have affected the parties' agreement . . . .

*Member Servs. v. Sec. Mut. Life Ins. Co.*, 2011 U.S. Dist. LEXIS 56910, at *10-11 (N.D.N.Y.

May 26, 2011) (quoting *Vt. Microsys.*, 88 F.3d at 151).  "The absence of evidence of any of these

factors is not dispositive," however, and the trier of fact may even "choose to award damages

solely" based on *one* of these factors.  *Linkco*, 230 F. Supp. 2d at 504.  "[T]his analysis

necessarily involves an element of approximation and uncertainty"; that cannot be helped.

*Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995).  Moreover, when

calculation of a reasonable royalty "is impeded by incomplete records of the infringer, adverse

inferences are appropriately drawn."  *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572

(Fed. Cir. 1996).  The same adverse interest should be drawn when, as in this case, the infringer's

default has deprived the plaintiff of the opportunity to conduct discovery.

 Dow Jones's costs of developing the information Ransquawk misappropriated are

considerable—whether measured in money, time, or effort.  Dow Jones's global news department

includes more than 1,800 journalists working in 45 countries.  (Malatesta Decl. ¶ 13.)  Dow

Jones incurs millions of dollars in expenses each year running its newswire business.  (*Id.*)

Dow Jones also spent over $1 million in software development costs to create the time-

advantaged DJ Dominant platform.  (*Id.*)

 These development and operating costs are substantial, and underlie the value of the news

content that Ransquawk has stolen.  The hypothetical fee that Dow Jones would charge

Ransquawk and others for a license to redistribute its news would include a royalty rate

calculated to recover those costs, plus a reasonable profit.  Thus, to quantify its damages, Dow

Jones relies for a benchmark on the hypothetical price it would charge Ransquawk for a licensing

agreement.[7]  In particular, as explained in the Malatesta Declaration, Dow Jones allows certain companies to provide content from Dow Jones's newswire products (not including DJ Dominant) to their subscribers, in a manner analogous to what Ransquawk does with DJ Dominant.  (*Id.* ¶ 15.)  For the right to do so, Dow Jones charges those companies a "wholesale" license fee that can be expressed as a discount of the product of (1) the number of subscribers the company has, and (2) the monthly retail price that Dow Jones charges for individual direct subscriptions to that newswire product.  (*Id.*)

The damages assessment, however, must take into account the fact that Dow Jones would not have willingly licensed DJX and its DJ Dominant content to Ransquawk at any price. (Compl. ¶ 27; Malatesta Decl. ¶¶ 16-17.)  That is because DJX "contains Dow Jones's best and most valuable content in the most valuable time frame," and due to its unique, time-advantaged nature, it "was designed not to be licensed to any third party" (*id.* ¶ 16)—let alone a direct competitor such as Ransquawk.  For these reasons, Ransquawk would not be offered any wholesale discount for DJX (Malatesta Decl. ¶¶ 16-18). As explained in one leading case, "[t]he setting of a reasonable royalty rate" must take into account the plaintiff's "policy of not licensing" the infringed property right, as the alternative would "make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon" an unwilling rightsholder.  *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1158, 1164 (6th Cir. 1978).[8]  Courts must also "give proper weight" in setting the reasonable royalty rate "to the

---

[7] *See* 1-20 Chisum on Patents § 20.07[2][b] ("Courts give weight to the licensing customs in the industry and actual licenses on comparable patents in determining . . . the reasonable royalty."); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1164 (6th Cir. 1978); *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116,  1120 (S.D.N.Y. 1970).

[8] *See also Georgia-Pacific*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (court may consider "[t]he [plaintiff's] established policy . . . [of] not licensing others to use the invention"); *Bose Corp. v. JBL, Inc.*, 112 F. Supp. 2d 138, 165 (D. Mass. 2000) (plaintiff's "policy of not licensing its technology" "weigh[s] in favor of a higher royalty rate").

fact that the parties are direct competitors in the marketplace," as a rightsholder "may be more reluctant to license . . . to a direct competitor and thus charge the competitor a higher rate." *Mickowski v. Visi-Trak Corp.*, 36 F. Supp. 2d 171, 181 (S.D.N.Y. 1999); *see also Telemac Corp. v. US/Intelicom Inc.*, 185 F. Supp. 2d 1084, 1101-1102 (N.D. Cal. 2001). For example, in *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1168 (Fed. Cir. 1991), the court affirmed the calculation of a reasonable royalty that was between 500% and 830% higher than the rates at which the plaintiff had licensed similar products in the past, because the plaintiff had never licensed the particular product at issue, and there was evidence that it "intended to maintain its exclusivity of th[at] technology . . . by refusing to grant licenses."

The resulting calculations of a hypothetical monthly license fee to Ransquawk are set forth in the accompanying Malatesta Declaration. (Malatesta Decl. ¶¶ 13-21, Exhs. F-P.)

Because Ransquawk failed to appear, Dow Jones does not know when Ransquawk began misappropriating its hot news. However, that misappropriation started no later than September 24, 2013, and it continues to this day. Thus, at minimum, the hypothetical monthly reasonable royalty should be multiplied by six months—resulting in a theoretical compensatory damage award far in excess of the $5 million in damages Dow Jones stated in its complaint. Because that complaint conservatively prayed for a damages "in an amount . . . not less than $5 million," Fed. R. Civ. P. 54(c) arguably limits this Court's actual award of damages to $5 million— notwithstanding that Dow Jones would be entitled to many times more under the governing substantive law.

### C.   Punitive Damages Should Be Assessed

Punitive damages are available under New York law for both of Dow Jones's causes of action. *See Getty Petrol. Corp. v. Island Transp. Corp.*, 878 F.2d 650, 657 (2d Cir. 1989) ("In the context of a claim for unfair competition, . . . New York case law clearly permits punitive

damages where a wrong is aggravated by recklessness or willfulness, . . . whether or not directed at the public generally."); *Int'l Minerals & Resources, S.A. v. Bomar Resources, Inc.*, 5 F. App'x 5, 9 (2d Cir. 2001) ("[I]n the context of an action under New York law for tortious interference with contract, 'an injured party can recover punitive damages when the tortious act complained of involved a wanton or reckless disregard of the plaintiff's rights.'" (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986)).[9]

This standard is met here.[10]   As described above, Ransquawk was consciously designed, from the ground up, to skirt intellectual property laws.  If there is any doubt Ransquawk's misconduct was *originally* intentional and in wanton disregard of Dow Jones's rights, there is zero doubt this standard is met for Ransquawk's continuing misappropriation following Dow Jones's November 11, 2013 cease-and-desist letter.  (Compl. ¶ 36 & Ex. B.)   After receiving that letter, which set forth in detail the wrongful nature of Ransquawk's conduct, Ransquawk at a minimum misled its London attorneys to make inaccurate statements about how it was obtaining DJ Dominant content; continued its misappropriation unabated; and went so far as to block Dow Jones's counsel from accessing its service, *and even its public homepage*, in order to impede Dow Jones's ability to monitor its illicit activity.  (Compl. ¶¶ 36-42; Pinto Decl. ¶¶ 12, 14.)

---

[9] The Second Circuit distinguishes an "ordinary" tortious-interference claim with a tortious-interference claim in a case where the plaintiff and the defendant were already "in a contractual relationship"; in the latter type of case, there may be an additional requirement that the defendant's conduct "be part of a pattern directed at the public generally."  *Carvel v. Noonan*, 350 F.3d 6, 24-25 (2d Cir. 2003).  Dow Jones alleges no contractual relationship between Dow Jones and Ransquawk, and Ransquawk has disclaimed any such relationship.  (Compl. ¶ 39.)  Accordingly the "public harm" standard does not apply.  *See Carvel*, 350 F.3d at 25.

[10] The fact that Ransquawk has failed to appear does not preclude an award of punitive damages.  *See Action S.A. v. Marc Rich & Co., Inc.*, 951 F.2d 504, 509 (2d Cir. 1991) (affirming decision to award punitive damages on default judgment); *Amador v. Galbreath*, 2013 U.S. Dist. LEXIS 58712, at *10-12 (W.D.N.Y. Apr. 24, 2013) (awarding punitive damages on default judgment); *Merino v. Beverage Plus Am. Corp.*, 2012 U.S. Dist. LEXIS 140679, at *13-14 (S.D.N.Y. Sept. 25, 2012) (same).

Because the amount of punitive damages is within the discretion of the trier of fact (and because Dow Jones's compensatory damages easily already reach the $5 million prayed for in the Complaint), Dow Jones leaves the quantification of punitive damages to the Court's discretion in the event less than $5 million in compensatory damages is awarded.  *See United States v. Hooker Chems. & Plastics Corp.*, 748 F. Supp. 67, 77-78 (W.D.N.Y. 1990) (discussing standards used by trier of fact in quantifying punitive damages).

### D.       Dow Jones Is Entitled To Injunctive Relief

Dow Jones is also entitled to a permanent injunction barring Ransquawk from further hot news misappropriation and tortious interference with contract.  A permanent injunction is available when (1) the plaintiff "has suffered an irreparable injury"; (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury"; (3) the "balance of hardships" tips in favor of the plaintiff; and (4) "the public interest would not be disserved by a permanent injunction."  *eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

These requirements are satisfied here.  Ransquawk's ongoing conduct causes irreparable injury not fully remediable through money damages.  It "not only devalues [Dow Jones's] news products, it also threatens the very economic structure upon which journalistic enterprises such as Dow Jones are built."  (Compl. ¶ 4; *see also id.* ¶¶ 34, 48.)  Beyond directly siphoning off customers and threatening to undermine Dow Jones's business model, it injures Dow Jones's consumer goodwill in ways impossible to quantify.   (Compl. ¶¶ 53, 63; Malatesta Decl., ¶¶ 9-10 (describing customer complaints to Dow Jones resulting from Ransquawk's devaluation of Dow Jones's product).)  *See Inventio AG v. Otis Elevator Co.*, 2011 U.S. Dist. LEXIS 87215, at *6-8 (S.D.N.Y. Aug. 4, 2011) ("loss of market share, brand name recognition, reputation as an innovator, and goodwill have historically been found to be 'irreparable' injuries").  Because Dow Jones has sought to carefully preserve its "sole source" identity for its premier DJ Dominant

product, the misconduct of Ransquawk is particularly injurious.  If Dow Jones were limited to repeated damage actions for ongoing infringement, defendant effectively would have created a compulsory license regime against Dow Jones's will.

For similar reasons, courts routinely find irreparable harm and grant injunctions in cases of intellectual-property misappropriation, including hot news misappropriation.  *See INS*, 248 U.S. at 245-46 (granting injunction against hot news misappropriation); *Barclays Capital, Inc. v. Theflyonthewall.com*, 700 F. Supp. 2d 310, 343-348 (S.D.N.Y. 2010) (same), *rev'd*, 650 F.3d 876 (2d Cir. 2011) (holding hot news claim preempted, but without questioning the propriety of injunctive relief for a *non*-preempted hot news claim); *accord eBay*, 547 U.S. at 394-95 (Roberts, C.J., concurring) (noting that irreparable harm will often be appropriate in intellectual-property cases "given the difficulty of protecting a right to *exclude* through monetary remedies that allow an infringer to *use* [intellectual property] against the [rightsholder's] wishes").

Moreover, the balance of harms clearly favors Dow Jones, and the public would not be disserved by an injunction of Ransquawk's parasitic conduct.  To the contrary, *declining* to enter an injunction would disserve the public by hampering the ability of bona fide journalistic organizations such as Dow Jones to bear the enormous expense of reporting the news day in and day out.  (Compl. ¶¶ 12; Malatesta Decl. ¶¶ 2, 12-13.)  *See Barclays*, 700 F. Supp. 2d at 343-44 ("public policy considerations" required entry of injunction in order to preserve plaintiffs' incentive to create valuable content notwithstanding high costs of production).

A proposed form of judgment including the requested injunction is attached as Exhibit M to the Pinto Declaration.

## <u>CONCLUSION</u>

For the reasons stated above, judgment should be entered against Ransquawk, and

Dow Jones should be awarded damages and injunctive relief as set forth above.


Dated:  New York, New York

April 23, 2014

<div style="margin-left: 40%;">

Respectfully Submitted,
PATTERSON BELKNAP WEBB & TYLER LLP


By:  _____/s/ Robert P. LoBue_____
Robert P. LoBue (rplobue@pbwt.com)
Jonah M. Knobler (jknobler@pbwt.com)
Adam E. Pinto (apinto@pbwt.com)
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000 (phone)
(212) 336-2222 (fax)

*Attorneys for Plaintiff Dow Jones & Company, Inc.*

</div>