```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------X
DOW JONES & COMPANY, INC.,                :
                                          :
                Plaintiff,                :    14 Civ. 131 (JMF) (GWG)
                                          :
        -against-                         :    REPORT AND
                                          :    RECOMMENDATION
                                          :
REAL-TIME ANALYSIS & NEWS, LTD.,          :
                                          :
                Defendant.                :
---------------------------------------------------------------X
```

**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

Plaintiff Dow Jones & Company, Inc. ("Dow Jones") brings this action against defendant Real-Time Analysis & News, Ltd. d/b/a Ransquawk ("Ransquawk") to recover damages stemming from Ransquawk's misappropriation of Dow Jones's news stories and its tortious interference with Dow Jones's contractual relationships. A default and permanent injunction have already been entered against Ransquawk. The only remaining issue is the amount of damages Dow Jones should be awarded.

I.      BACKGROUND

Dow Jones filed its complaint on January 9, 2014, see Complaint and Demand for Jury Trial, filed Jan. 9, 2014 (Docket # 1) ("Compl."), which was served on Ransquawk on January 15, 2014, see Certificate of Mailing, filed Jan. 15, 2014 (Docket # 2). The complaint contained causes of action for "hot news" misappropriation and tortious interference with contractual relationships under New York law. See Compl. ¶¶ 43-64. Ransquawk failed to respond to the complaint, and on February 20, 2014, Dow Jones obtained a Clerk's certificate of default. See Clerk's Certificate, filed Feb. 20, 2014 (Docket # 5). Dow Jones moved for a default judgment,

submitting papers that included declarations and documentary evidence that set forth their request for an award of damages.[1]

On May 15, 2014, Judge Furman issued a "Final Judgment and Permanent Injunction" (Docket # 19) ("May 15 Order"). In the May 15 Order, Judge Furman found that Dow Jones's complaint "states a claim for relief against Ransquawk on both causes of action," May 15 Order at 1, and granted Dow Jones's request for a permanent injunction against Ransquawk, see id. at 2-3. He also referred the matter to the undersigned for an inquest as to damages. See Order of Reference to Magistrate Judge, filed May 15, 2014 (Docket # 17). On May 19, 2014, this Court issued an Order giving Ransquawk until June 30, 2014, to oppose the damages claimed in Dow Jones's submissions. See Scheduling Order, filed May 19, 2014 (Docket # 20), ¶ 2. This Order notified the parties that the Court would conduct the inquest based upon the written submissions of the parties unless a party sought an evidentiary hearing. Id. ¶ 3. A copy was mailed to Ransquawk's business address.

Because the default entered in this case establishes Ransquawk's liability, see Bambu Sales, Inc. v. Ozak Trading Inc., 58 F.3d 849, 854 (2d Cir. 1995) (citation omitted), the only remaining issue is whether Dow Jones has supplied adequate support for the relief it seeks, see Kuruwa v. Meyers, 823 F. Supp. 2d 253, 256 (S.D.N.Y. 2011), aff'd, 512 F. App'x 45 (2d Cir. 2013); accord GAKM Res. LLC v. Jaylyn Sales Inc., 2009 WL 2150891, at *2 (S.D.N.Y. July

---

[1] See Plaintiff Dow Jones & Company, Inc.'s Memorandum of Law in Support of its Order to Show Cause for Entry of Default Judgment, Injunction and Damages, filed May 12, 2014 (Docket # 14) ("DJ Mem."); Declaration of Jason Malatesta in Support of Plaintiff's Motion for Default Judgment, filed May 12, 2014 (Docket # 15) ("Malatesta Decl."); Declaration of Adam E. Pinto in Support of Plaintiff's Motion for Default Judgment, filed May 12, 2014 (Docket # 16); Supplemental Declaration of Adam E. Pinto in Support of Plaintiff's Order to Show Cause for Entry of Default Judgment, filed May 15, 2014 (Docket # 18) ("Pinto Supp. Decl.").

20, 2009) ("A default judgment that is entered on the well-pleaded allegations in a complaint establishes a defendant's liability . . . and the sole issue that remains before the court is whether the plaintiff has provided adequate support for the relief it seeks.") (citations omitted).  The Second Circuit has held that a damages inquest may be held on the basis of documentary evidence alone "as long as [the court has] ensured that there was a basis for the damages specified in [the] default judgment."  Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); accord Action S.A. v. Marc Rich & Co., Inc., 951 F.2d 504, 508 (2d Cir. 1991).

Neither party has requested an evidentiary hearing, and Ransquawk has not made any submission to the Court.  Because Dow Jones's submissions provide a basis for an award of damages, no hearing is required.

II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

In light of Ransquawk's default, Dow Jones's properly-pleaded allegations, except those related to damages, are accepted as true.  See, e.g., City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint.") (citing Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004)); Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009) ("In light of [defendant's] default, a court is required to accept all . . . factual allegations as true and draw all reasonable inferences in [plaintiff's] favor.") (citation omitted).  Thus, the Court's findings of fact are based on the allegations in Dow Jones's complaint regarding liability and the admissible evidence regarding damages contained in its submissions.

A. <u>Facts Relating to Liability</u>

Dow Jones is a Delaware corporation with its principal place of business in New York, New York. Compl. ¶ 5. Ransquawk is a "United Kingdom limited company" with its principal place of business in London, United Kingdom. <u>Id.</u> ¶ 6. Dow Jones is a "widely known and respected publisher of business news and information" that "provides news and information through its newswires, websites, newspapers, newsletters, databases, magazines, and radio and video reports." <u>Id.</u> ¶ 12. Dow Jones "collect[s] and provide[s] accurate, comprehensive, and timely news and business information to its millions of worldwide customers through the significant efforts of its journalists and its substantial investments in its worldwide journalistic infrastructure." <u>Id.</u> Dow Jones's flagship publication, <u>The Wall Street Journal</u>, is America's largest newspaper by paid circulation, having more than 2.2. million readers. <u>Id.</u> ¶ 13. Dow Jones also publishes <u>Barron's</u> and "MarketWatch.com" and operates "Dow Jones Newswires," which "provides real-time business news and information to hundreds of thousands of financial professionals around the world." <u>Id.</u> Dow Jones's global news department "includes more than 1,800 journalists working in 45 countries, and Dow Jones incurs millions of dollars of expenses annually that are attributed to its newswire business alone." Malatesta Decl. ¶ 13. "With only a few carefully chosen exceptions, Dow Jones serves as the exclusive distributor of its original news content and does not authorize third parties to distribute that content." Compl. ¶ 14.

Since 2013, Dow Jones has operated "DJX," which is "an online product that includes original news and analysis from all Dow Jones-owned publications and other news and information resources." <u>Id.</u> ¶ 13. DJX "provides real-time online news and analysis to paid subscribers via live, streaming newsfeeds of headlines and articles generated by Dow Jones." <u>Id.</u> ¶ 15. One of the newsfeeds streamed on DJX, "DJ Dominant," "compiles in one place exclusive

4

real-time news and analysis from Dow Jones and The Wall Street Journal that can impact markets and that is available nowhere else in the world." Id. ¶ 16. When Dow Jones reporters "break news," Dow Jones "typically posts to DJ Dominant one or more stand-alone headlines to rapidly communicate hot news to DJX subscribers" and "supplements those headlines with full-text articles shortly thereafter." Id. ¶ 17. Because DJ Dominant is a "time-advantaged service," it contains "Dow Jones's hottest, most time-sensitive news before Dow Jones publishes that news everywhere else." Id. ¶ 18. Thus, "Dow Jones's hot news is typically published first on DJ Dominant via DJX, then to Dow Jones Newswires customers who have not subscribed to DJX, then to WSJ.com, and then in the print edition of The Wall Street Journal the next day." Id. Dow Jones's "scoops" are made "available exclusively to DJX subscribers before others see [them]." Id. ¶ 19. Because "[t]he electronic delivery of business and financial news is a highly competitive business," Dow Jones touts its ability "to break news that can impact markets before other sources do" and "highlights this feature for current and potential subscribers, emphasizing that DJX can help put them in position to identify and analyze investing, trading, and hedging opportunities and capitalize on them before their competitors." Id. ¶ 20.

"Customers subscribe directly to DJX by entering into a paid subscription agreement with Dow Jones." Id. ¶ 21. This agreement "permits users to 'access, review, download, and print' information from DJX for the user's own use" but specifically requires that "users not 'reproduce, distribute, display, sell, publish, broadcast, or circulate' DJX content to any third party, or make that content available for any such use." Id. Thus, "[a]ll subscribers to DJX must sign either the Dow Jones ['Master Agreement'] or similar contractual terms restricting their ability to redistribute DJX content." Id. ¶ 21.

Ransquawk is a competitor that targets the same customer base as Dow Jones and purports to provide "unmatched, instant coverage of Equities, Fixed Income, Energy & Forex." See id. ¶ 23; see also id. ¶ 33 ("Ransquawk competes directly with Dow Jones's DJX product for subscriptions by end-users."). Ransquawk operates a commercial website, "ransquawk.com," that claims to "deliver a faster, clearer unbiased real-time voice & text newsfeed" to its customers. Id. ¶ 23. Ransquawk offers a "subscription-based software application accessed over the Internet and through a mobile app" that includes "a live audio 'squawk' broadcast (the 'audio' component) and an auto-updating text-based newsfeed (the 'text' component) that allows subscribers to 'see what [they] hear.'" Id. ¶ 24. According to Ransquawk's website, the Ransquawk application "monitors over 100 news sources" and "aggregates all the major news wires and delivers the information that counts." See id. ¶¶ 24-25. Ransquawk's website "charges variable rates to subscribers based on how many individual 'listeners' will have access to Ransquawk's content" and "based on the subscriber's country of residence." Pinto Supp. Decl. ¶ 7. As of May 12, 2014, Ransquawk charged "a United States customer with 1-10 listeners . . . $300.00 per listener per month, in addition to a $100 set-up fee" for its "multi-asset" package. See id.

Ransquawk's "services are based on the systematic unauthorized reproduction and redistribution of news content published by Dow Jones." Compl. ¶ 26. Ransquawk "copies and retransmits verbatim, or nearly verbatim, content from the DJ Dominant newsfeed that was reported, written, and edited by journalists working for The Wall Street Journal, Barron's, Dow Jones Newswires, and other Dow Jones publications" and "has done so without any license from Dow Jones." Id. ¶ 27. Ransquawk's audio-service "often broadcasts DJ Dominant headlines within five seconds or less of the original posting [of the content] on DJX." Id. ¶ 28. For

example, Dow Jones published on DJX a breaking news headline announcing Twitter's initial public offering, and within two seconds of the content running on DJ Dominant, Ransquawk broadcasted the same headline "word-for-word" through its audio feed service.  See id. "Ransquawk's text service similarly copies DJ Dominant news that has just been published on DJX . . . [and such] headlines typically appear within one or two minutes of that news having been posted on DJX."  Id. ¶ 29.  Ransquawk does not credit Dow Jones or other news providers for the stories it copies, instead attributing them to "Source: Newswires."  Id. ¶ 30.

According to Dow Jones, "[b]ecause Ransquawk distributes news copied verbatim from DJX in competition with DJX without incurring the costs Dow Jones incurs to originate the news, Ransquawk is able to offer its products and services at a substantially lower price than Dow Jones can offer similar products and services."  Id. ¶ 34.  Thus, "Ransquawk's actions divert business opportunities for Dow Jones and, for many potential customers, threaten to satisfy the demand for breaking business news that would otherwise be fulfilled by DJX."  Id. "Ransquawk's free-riding on Dow Jones's extensive newsgathering efforts is likely to undermine Dow Jones's economic incentive to invest in the costly process of reporting time-sensitive news."  Id.

Between October 17, 2013, and November 13, 2013, Dow Jones monitored Ransquawk's audio and text services and tracked which stories Ransquawk copied from the DJ Dominant newsfeed.  See id. ¶ 31.  Dow Jones investigated Ransquawk's activities by signing up for free trial subscriptions to Ransquawk's service that were made available to "New York residents who, as part of signing up for the trial, had to identify themselves as U.S. residents living in the Eastern Time Zone and provide phone numbers – all of which had New York area codes."  Id. ¶ 35.  From this investigation, Dow Jones compiled a chart listing 37 exclusive DJ Dominant

7

headlines that Ransquawk copied during this time period.  <u>See</u> Chart (attached as Ex. A to Compl.).  The chart shows that Ransquawk's audio feed consistently copied DJ Dominant headlines within a minute, and often within ten seconds, of those headlines first appearing on DJX; similarly, Ransquawk's text service copied the headlines within a few minutes of those stories first appearing on DJX.  <u>See</u> <u>id.</u>

On November 11, 2013, Dow Jones sent Ransquawk a "cease-and-desist" letter informing Ransquawk that "it was copying DJX content in a manner that constituted 'hot news' misappropriation and in breach of, or tortious interference with, Dow Jones's subscription agreements" and demanding that "Ransquawk cease its unauthorized copying of Dow Jones's content and remove Dow Jones's content from its computers."  Compl. ¶ 36; <u>see</u> <u>also</u> Cease and Desist Letter, dated Nov. 11, 2013 (attached as Ex. B to Compl.).  Ransquawk replied in a letter dated November 26, 2013, asserting that it "has not entered directly or indirectly into a subscriber agreement for the DJX service" and denying that it "took any material directly from DJX."  Compl. ¶ 39; <u>see</u> <u>also</u> Letter from Macrae & Co. LLP, dated Nov. 26, 2013 (attached as Ex. C to Compl.).  Ransquawk continued to reproduce DJX content on its audio and text services for at least two days from the time that the cease and desist letter was emailed to Ransquawk's principal.  Compl. ¶ 37.

B.     <u>Claimed Damages</u>

Judge Furman has already found that the complaint "states a claim for relief against Ransquawk" for both its New York state "hot news" misappropriation claim and its New York state tortious interference with contractual relations claim.  <u>See</u> May 15 Order at 1.  We thus assume New York law applies and now determine what relief is available under either or both of these causes of action.  Dow Jones asks the Court to award it $5 million in compensatory

8

damages, although it asserts that the award it could theoretically win is "far in excess of the $5 million in damages [it] stated in its complaint." DJ Mem. at 23. Furthermore, Dow Jones argues that, to the extent that it is found that Dow Jones is not entitled to $5 million in compensatory damages, the Court should exercise its discretion to grant Dow Jones punitive damages. See id. at 23-25. Dow Jones has calculated its damages based on a "reasonable royalty" rate, or in other words, what it "would charge Ransquawk and others for a license to redistribute its news." Id. at 21.

To explain this method of calculating damages, Dow Jones has submitted a sworn declaration from Jason Malatesta, Dow Jones Executive Director of Business Management. See Malatesta Decl. ¶¶ 13-21. According to Malatesta, "[t]he lowest available monthly cost of a DJX subscription is $249.00 per month . . . [and] [t]here is no discount offered on a volume basis." Id. ¶ 14. Thus, a corporate subscriber would pay "at least $249.00 times the number of users within its organization." Id. Although Dow Jones offers some of its products to certain distributors at a discounted wholesale rate, see id. ¶ 15, it does "not offer DJX at a wholesale rate to any distributors because . . . [i]t contains Dow Jones's most exclusive and therefore valuable content in the most valuable time frame, including DJ Dominant," id. ¶ 16. As such, Dow Jones does not "license any of DJ Dominant's content to third parties for use during its time-advantaged exclusive window, as this would undercut the advantage that Dow Jones provides to its subscribers." Id.

Malatesta further asserts that Dow Jones "would not have agreed to any distribution arrangement with Ransquawk had it requested one, because . . . Ransquawk is considered a direct competitor whose customer base is DJX's and Dow Jones Newswire's target market," and thus, allowing Ransquawk to use Dow Jones's time-advantaged content would "undercut the

9

business model of the DJX product." Id. ¶ 17.  Accordingly, Dow Jones would not have offered Ransquawk any wholesale discount and would not have licensed "DJX subscriptions to Ransquawk at a rate of less than $249.00 per subscriber." Id. ¶ 18.

Malatesta has "estimate[d] the total number of Ransquawk subscribers to be 15,000, the lowest number [he has] seen reported by Ransquawk." Id. ¶ 19.  To explain this estimate, Malatesta has attached to his declaration a November 28, 2011 press release hosted on Reuters.com stating that Ransquawk has "a listener base of over 16,000 professional traders and brokers worldwide" (attached as Ex. H to Malatesta Decl.), a June 27, 2012 press release on PRWeb.com stating that Ransquawk has "over 16,000" listeners (attached as Ex. J to Malatesta Decl.), a page dated August 24, 2012, from Ransquawk's website stating that "Ransquawk provides audio news and commentary for over 15,000 professional traders and brokers worldwide" (attached as Ex. M to Malatesta Decl.), and a company summary on Ransquawk's LinkedIn webpage asserting that it has "over 25,000 listeners globally" (attached as Ex. O to Malatesta Decl.).

Multiplying 15,000 (the estimated number of Ransquawk users) by $249 (the individual monthly subscriber fee), Malatesta concludes that, if Dow Jones were to grant Ransquawk a license to redistribute the DJX content to its subscribers, it would charge "at minimum" $3.735 million per month.  See Malatesta Decl. ¶ 20.  Malatesta asserts that because of "competitive and product-positioning reasons," Dow Jones would in fact have charged Ransquawk a monthly licensing fee that is significantly greater than this amount.  See id. ¶ 21.  While Dow Jones has submitted evidence that Ransquawk has acted tortiously in this way for at least seven months, see Compl. ¶¶ 31-38; Pinto Supp. Decl. ¶ 3, Dow Jones does not seek more than $5 million in damages, see DJ Mem. at 23.

The Court has not been able to find any cases specifically discussing the proper measure of damages for "hot news" misappropriation claims arising under New York law.  Nevertheless, it has been noted that "hot news" misappropriation claims are simply "a branch of the unfair competition doctrine."  Fin. Info., Inc. v. Moody's Investors Serv., Inc., 808 F.2d 204, 209 (2d Cir. 1986); accord X17, Inc. v. Lavandeira, 563 F. Supp. 2d 1102, 1104 (C.D. Cal. 2007) ("The 'hot news' tort is a particularly hardy species of the common law tort of unfair competition through misappropriation.").  Under New York law, "[t]he basic rule of damage in a case of unfair business competition is the amount plaintiff would have made except for the wrongful acts of defendant."  Am. Elecs. v. Neptune Meter Co., 33 A.D.2d 157, 159 (1st Dep't 1969) (citing Michel Cosmetics v. Tsirkas, 282 N.Y. 195, 199 (1940) ("A wrongdoer who has imitated the containers of the plaintiff and has used the secret formulas and processes belonging to the plaintiff might be compelled to yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the cestui que trust.") (internal quotation marks and citation omitted) (emphasis removed)).

In an analogous cause of action, the tort of misappropriation of trade secrets, a plaintiff's damages are typically calculated based on "the revenue plaintiff would have made but for the defendant's wrongful conduct," or alternatively, "the profits unjustly received by the defendant."  Member Sevs., Inc. v. Sec. Mut. Life Ins. Co. of N.Y., 2011 WL 2133618, at *3 (N.D.N.Y. May 26, 2011).  However, in cases where it is difficult to assess the amount of profits that had been diverted from a plaintiff or where such amounts would not adequately compensate the plaintiff, courts have found that a plaintiff can recover the value of a "reasonable royalty" — an amount that attempts to approximate "what the parties would have agreed to as a fair licensing price at the time that the misappropriation occurred."  LinkCo, Inc. v. Fujitsu Ltd., 232 F. Supp. 2d 182,

186 (S.D.N.Y. 2002) (internal quotation marks and citations omitted); see also Member Sevs., Inc., 2011 WL 2133618, at *3 ("Where the defendant's gain or the plaintiff's loss is difficult to calculate, '[r]easonable royalty is a common form of award in . . . trade secret . . . cases.'") (quoting Vt. Microsystems, Inc. v. Autodesk, Inc., 138 F.3d 449, 450 (2d Cir.1998)). In the context of misappropriation of trade secrets, courts have considered the following factors in determining the amount of a reasonable royalty: "(1) the resulting and foreseeable changes in the parties' competitive posture; (2) the prices past purchasers or licensees may have paid; (3) the total value of the secret to the plaintiff, including plaintiff's development costs and the importance of the secret to the plaintiff's business; (4) the nature and extent of the use the defendant intended for the secret; (5) whatever other unique factors in the particular case might have affected the parties' agreement, such as the ready availability of alternative processes." LinkCo, Inc., 232 F. Supp. 2d at 186 n.7 (citation omitted).

Here, any attempt to assess Dow Jones's damages based on its revenue loss caused by Ransquawk's misappropriation of Dow Jones's hot news content would be purely speculative. Additionally, Ransquawk's failure to produce any discovery materials has prevented Dow Jones from being able to calculate damages based on the Ransquawk's unjustly obtained profits. Accordingly, the Court finds it appropriate here to award damages based on the reasonable royalty value — that is, a fair licensing fee for the misappropriated hot news content. We accept Dow Jones's methodology for calculating its fair licensing fee based on what it in fact charges similarly situated entities as Ransquawk to use the DJX content. This approach approximates what Dow Jones would have likely charged Ransquawk to use its DJX content and bears an appropriate relationship to Dow Jones's development costs. The rate sought is additionally supported by the DJX content's central role in Dow Jones's business model as well as

Ransquawk's flagrant distribution of this content to thousands of paid subscribers. Therefore, the Court finds that Dow Jones's claimed damages of $3.735 million per month reflects Dow Jones's actual damages with "reasonable" certainty. RGI Brands LLC v. Cognac Brisset-Aurige, S.a.r.l., 2013 WL 1668206, at *6 (S.D.N.Y. Apr. 18, 2013) ("On an inquest for damages following a default, plaintiff bears the burden of proof and must introduce sufficient evidence to establish the amount of damages with reasonable certainty.") (citing cases). Accordingly, Dow Jones should be awarded the $5 million it seeks as Dow Jones has shown that Ransquawk's misappropriation of the DJX hot news content continued for at least two months.

Because Dow Jones should recover its requested award of $5 million for its "hot news" misappropriation claim, we need not consider whether any additional recovery is appropriate under the claim for tortious interference or as punitive damages.

III.     CONCLUSION

For the foregoing reasons, Dow Jones should be awarded a judgment against Ransquawk in the amount of $5 million.

**PROCEDURE FOR FILING OBJECTIONS TO THIS
REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Jesse M. Furman at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Furman. If a party fails to file timely objections, that party will not be permitted to raise any

objections to this Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: September 15, 2014
      New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copy mailed to:

Real-Time Analysis & News, Ltd.
110 Bishopsgate, 22nd Floor
London, UK  EC2N-4AY

Real-Time Analysis & News, Ltd.
25 Copthall Ave.
London, UK  EC2R-7BP